UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DUSTIN PATRICK LANCASTER,<br><br>                    Plaintiff,<br><br>     v.<br><br>KAT AMOS, RORY O'CONNOR, and<br>KLINT STANDER,<br><br>                         Defendants. | Case No. 1:09-cv-00683-CWD<br><br>**MEMORANDUM DECISION AND<br>ORDER** |

The following motions are pending before the Court at this time: (1) Defendant

Kat (Katherine)[1] Amos's Motion for Summary Judgment (Dkt. 106); (2) Defendants Dr.

Klint Stander and Physician's Assistant (PA) Rory O'Connor's Motion for Summary

Judgment (Dkt. 107); (3) Plaintiff's Motion to Strike (Dkt. 109); (4) Defendants Stander

and O'Connor's Motion to Strike Paragraph Six of the Affidavit of Dustin Lancaster

(Dkt. 118); and (5) Defendant Kat Amos's Motion to Strike Paragraphs Five and Six to

the Affidavit of Dr. Paul Collins Filed August 1, 2013 (Dkt. 120).

All parties have consented to proceed before a United States Magistrate Judge.

(Dkt. 73.) Having reviewed the record in this matter, and having considered the

---

[1] As set forth in her Answer, Defendant Kat Amos's true name is Katherine Amos. (Dkt. 65.)

**MEMORANDUM DECISION AND ORDER - 1**

arguments of the parties in their briefing and at oral argument on November 25, 2013, the Court enters the following Order.

## INTRODUCTION

Plaintiff filed this prisoner civil rights case in December 2009, alleging that he received constitutionally inadequate medical care while incarcerated at two Idaho Department of Correction (IDOC) facilities. Following review under 28 U.S.C. §§ 1915(e) and 1915A, Plaintiff was permitted to proceed with his Eighth Amendment claims against Defendants Amos, O'Connor, and Stander. (Dkt. 8.) Discovery disputes (*see* Dkts. 58, 85, 90), delays in serving all of the Defendants (*see* Dkt. 64), two separate appearances of counsel for Plaintiff (Dkts. 43, 78), and a belated motion to amend the First Amended Complaint (Dkt. 83) all contributed to the protracted pretrial phase of this case.

On July 8, 2013, Defendants filed their Motions for Summary Judgment, after which the parties filed Cross-Motions to Strike portions of the supporting Affidavits and Declarations. Based on the record before the Court, the Motions to Strike will be denied, Defendant O'Connor's Motion for Summary Judgment will be granted, and Defendant Amos's and Defendant Stander's Motions for Summary Judgment will be denied. By request of the parties, this case will proceed to Alternative Dispute Resolution, with any remaining claims proceeding to jury trial beginning January 27, 2014.

**MEMORANDUM DECISION AND ORDER - 2**

## MOTIONS FOR SUMMARY JUDGMENT

**1.      Standard of Law**

**A.      *Summary Judgment***

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The requirement is that there be no genuine dispute as to any *material* fact. "Material facts are those that may affect the outcome of the case." *See id.* at 248. The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P.56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*,

**MEMORANDUM DECISION AND ORDER - 3**

809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must

consider "the cited materials," but it may also consider "other materials in the record."

Fed. R. Civ. P.56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would

be admissible in evidence." Fed. R. Civ. P.56(c)(2). Affidavits or declarations submitted

in support of or in opposition to a motion "must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant or declarant is

competent to testify on the matters stated." Fed. R. Civ. P.56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set

forth by the non-moving party. The evidence of the opposing party is to be believed,

*Anderson*, 477 U.S. at 255, and all inferences which can be drawn from the evidence must

be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at

630-31 (internal citation omitted). If the moving party meets its initial responsibility, the

burden then shifts to the opposing party to establish that a genuine issue (dispute) as to

any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's

position is insufficient. Rather, "there must be evidence on which the jury could

reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Rule 56(e)(3)

authorizes the Court to grant summary judgment for the moving party "if the motion and

supporting materials—including the facts considered undisputed—show that the movant

**MEMORANDUM DECISION AND ORDER - 4**

is entitled to it." Fed. R. Civ. P.56(e)(3).

**B.     *Section 1983 Claims***

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To state

a claim under § 1983, Plaintiff must show the existence of four elements: "(1) a violation

of rights protected by the Constitution or created by federal statute (2) proximately caused

(3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947

F.2d 1418, 1420 (9th Cir. 1991).[2] Section 1983 is "'not itself a source of substantive

rights,' but merely provides 'a method for vindicating federal rights elsewhere

conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v.

McCollan*, 443 U.S. 137, 144 n.3 (1979)).

"Liability under section 1983 arises only upon a showing of personal participation

by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted).

In other words, Plaintiff must show that Defendants' actions caused the deprivation of a

constitutional right. 42 U.S.C. § 1983*; Arnold v. International Business Machines Corp*.,

637 F.2d 1350, 1355 (9th Cir. 1981). "The causation requirement of § 1983 . . . is not

satisfied by a showing of mere causation in fact[;] [r]ather, the plaintiff must establish

proximate or legal causation." *Id*. The United States Court of Appeals for the Ninth

---

[2]42 U.S.C. § 1983, provides, in pertinent part, as follows:

  Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State, . . .  subjects or causes to be subjected, any citizen of the United
States or other person within the jurisdiction thereof to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws, shall be liable to the party
injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

**MEMORANDUM DECISION AND ORDER - 5**

Circuit has explained: "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivations of which he complains." *Id.* (internal citation omitted).

### C.   *Eighth Amendment Claims of Inadequate Medical Care*

To state a claim under the Eighth Amendment, Plaintiff must show that he is incarcerated "under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citation omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition

**MEMORANDUM DECISION AND ORDER - 6**

that significantly affects an individual's daily activities; or the
existence of chronic and substantial pain . . . .

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted),

*overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)

(en banc).

As to the subjective standard, a prison official acts with "deliberate indifference . .

. only if the [prison official] knows of and disregards an excessive risk to inmate health

and safety." *Gibson v. Cnty. of Washoe, Nev.,* 290 F.3d 1175, 1187 (9th Cir. 2002)

(citation and internal quotation marks omitted). "Under this standard, the prison official

must not only 'be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists,' but that person 'must also draw the inference.'"

*Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at

837). "If a [prison official] should have been aware of the risk, but was not, then the

[official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*,

290 F.3d at 1188 (citation omitted). Nonetheless, "whether a prison official had the

requisite knowledge of a substantial risk is a question of fact subject to demonstration in

the usual ways, including inference from circumstantial evidence, . . . and a factfinder

may conclude that a prison official knew of a substantial risk from the very fact that the

risk was obvious." *Farmer*, 511 U.S. at 842; *see also Lolli v. County of Orange*, 351 F.3d

410, 421 (9th Cir. 2003) (deliberate indifference to medical needs may be shown by

circumstantial evidence when the facts are sufficient to demonstrate that defendant

**MEMORANDUM DECISION AND ORDER - 7**

actually knew of a risk of harm).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi,* 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). Nor does the Eighth Amendment provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Finally, a mere delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060.

## 2.    Undisputed Facts

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts.

**MEMORANDUM DECISION AND ORDER - 8**

At the time of the allegations in this lawsuit, Plaintiff was an inmate in the custody of the Idaho Department of Correction (IDOC). In April 2009, Plaintiff injured his left elbow while incarcerated at North Idaho Correctional Institution (NICI). (Dkt. 107-12, pp.6-7.) He had surgery on his elbow the next day, and his arm was in a cast until May 8, 2009. (*Id.*, p.7.)

On May 12, 2009, Plaintiff was transferred to the Idaho State Correctional Institution (ISCI) and the next day, ISCI Physicians Assistant (PA) Takagi examined Plaintiff and noted that "in-cell ROM [range of motion] stretches has [sic] not increased ROM." PA Takagi completed a consultation request that stated: "Physical Therapy x 1 w/ in cell exercise instruction." (Dkt. 108, p.117.) At the top of the request, both the "off-site" and the "on-site clinic" boxes were checked, with the clarifying note, "whichever available sooner." The boxes denoting "Urgent," "Routine," or "Retro Request," were not marked. Another handwritten note at the top of the request read: "Sent to K. Amos 5-13-09," and the note is initialed by "S.V." (*Id.*)[3] A Physician's Orders Notation from the same date similarly shows, "Pt referal [sic] – to K. Amos," signed by LPN S. Voorstead. (Dkt. 108-2, p.4.)

Defendant Katherine Amos is "Kat" or "K." Amos, the intended recipient of the consultation request. At the time, she was the "off-site scheduler" for ISCI. (Dkt. 106-3,

---

[3] Ms. Amos declares by Affidavit that she never received Plaintiff's May 13, 2009 consultation request for physical therapy; otherwise, her stamp, date and initials would have been on it to indicate that the request had been sent to the Regional Medical Director. (Dkt. 106-3.) Ms. Amos does not know why she never received the request, but surmises that it may have been misfiled in Plaintiff's medical chart instead of being routed to her. (*Id.*) Plaintiff asserts that Ms. Amos did receive the request.

**MEMORANDUM DECISION AND ORDER - 9**

p.2.) In her job as the off-site scheduler, Ms. Amos did not physically assess an inmate's

medical condition, diagnose or treat inmates, nor could she order off-site or on-site

consultations. (*Id.*) Rather, Ms. Amos received consultation requests from ISCI medical

providers and then forwarded them to the Regional Medical Director for approval. She

could not schedule an off-site consultation without such approval. (*Id.*) It was her usual

and customary practice to stamp, date and initial the consultation requests that she had

sent to the Regional Medical Director and place them in a file so she knew which requests

were outstanding. (*Id.*) Once she received the Director's response, she would either

forward the denial back to the requesting medical provider, or if the request was

approved, she would schedule the off-site appointment. (*Id.*, pp.2-3.)

On May 15, 2009, Plaintiff filed an Offender Concern Form requesting physical

therapy for his broken arm (Dkt. 107-12, p.25).

On May 22, 2009, orthopaedic surgeon Dr. Boyea faxed a letter addressed to "Kat,

IDOC," stating: "It is important that he [Plaintiff] be seen and follow [sic] up by an

Orthopaedic [sic] Surgeon to make sure the fracture is healing and he gets return of

function and motion. He should be out of his cast and be have [sic] started Physical

Therapy. When an Orthopaedic [sic] Surgeon is identified, please contact me so I can

inform them of the injury pattern and operative intervention that was preformed [sic]."

(Dkt. 106-5, p.4.) There is a handwritten note of "F/u w/ provider OPC 1 week," dated

"6/9/09" on the face of the letter. (*Id.*)

On June 3, 2009, Plaintiff filed a grievance, stating: "I shattered my radius on 4-

**MEMORANDUM DECISION AND ORDER - 10**

13-09 in Cottonwood. I had surgery on 4-13-09 where I had 9 screws and a metal plate in

to hold my bone together. I was suppose [sic] to start physical therapy on 5-4-09

according to my surgeon. At this point, I cannot move my left arm and I am in a lot of

pain. (Dkt. 114-1, p.1.) On June 10, 2009, that grievance was routed to Director of

Nursing J. Donaldson for response. (*Id.*)

On June 10, 2009, PA Takagi completed a consultation request for Plaintiff that

said: "Orthopedic assessment & follow-up." Within the "described signs and symptoms"

portion of the request, Takagi noted: "[Patient] has not yet been started on PT post

surgery." Takagi also noted that, "his orthopaedic surgeon has sent a letter requesting this

follow-up which I have included."[4] (Dkt. 108, p.116.) The request is not marked

"Urgent," "Routine," or "Retro Request." (*Id.*)

On June 18, 2009, Plaintiff was transferred to the Idaho Correctional Center (ICC).

His medical records were not transferred at this time; the two intrasystem transfer forms

that were sent to ICC listed Plaintiff's current medication, but indicated he had no current

acute problems, no current treatments, and no physical disabilities. (Dkt. 108-4, pp.1-2.)

The ICC nurse who completed Plaintiff's Initial Health Screening Form on June 18, 2009,

noted Plaintiff's medications and a "contracture of left elbow" but did not refer Plaintiff

---

[4] Similar to the May 13, 2009 consultation request, Ms. Amos declares by Affidavit that she never saw this June 10, 2009 consultation request or the surgeon's letter until after she answered and appeared in this lawsuit in 2012. (Dkt. 106-1.) There is no customary stamp, date, or initials on the June 10, 2009 consultation request to indicate that Ms. Amos received it and forwarded it to the Regional Medical Director for approval.

**MEMORANDUM DECISION AND ORDER - 11**

to a medical provider. (Dkt. 108, p.7; Dkt. 107-5, p.3.)

The response to the June 3, 2009 grievance about the lack of physical therapy is marked "Date Due Back: 6/20/09." (Dkt. 114-1, p.1.) On July 5, 2009, Director of Nursing J. Donaldson provided the following written response to the grievance:

> You were moved to the ICC Facility and your medical issues should be addressed by the staff there. I talked to Kat Amos who is our offsite scheduler and she tells me you were scheduled and seen by our Physical Therapy staff on site. If you are continuing to have problems please ask the Medical Staff at ICC to address your needs.

(*Id.*)[5]

There are no allegations that Ms. Amos had any further involvement in Plaintiff's care after this date. The remainder of the facts concern Plaintiff's medical care at the new facility, ICC.

Defendant Rory O'Connor was employed as a Physician's Assistant (PA) at ICC and provided medical care to Plaintiff from June 18, 2009 through September 24, 2009. (Dkt. 107-6, pp.1-2.) From September 2008 to March 2011, Dr. Klint Stander was employed as the ICC Medical Director and Lead Physician; part of his duties included supervising the ICC medical staff, including PA O'Connor. Dr. Stander personally oversaw Plaintiff's medical care while Plaintiff was housed at ICC. (Dkt. 107-7, pp.1-2.) The medical care and treatment provided to Plaintiff by Defendants O'Connor and

---

[5] Ms. Amos does not have a recollection of making this statement to Nurse Donaldson, and declares by Affidavit that she does not understand it because she could never approve consultation requests for physical therapy and recalls that there were no on-site physical therapists at ISCI at that time. (Dkt. 106-1.)

**MEMORANDUM DECISION AND ORDER - 12**

Stander is summarized as follows:

July 6, 2009          PA O'Connor examined Plaintiff for an unrelated medical
                      condition but noted "left arm flexion contracture due to delay
                      in PT to work on ROM following surgery"; planned to take x-
                      rays, consult with orthopedics and "attempt to set up PT to try
                      and improve ROM" (Dkt. 108, p.48.)

July 13, 2009         Plaintiff filed a grievance form at ICC complaining about his
                      left arm and requested "proper medical attention" including
                      physical therapy and something for the pain (Dkt. 114-2, p.1.)

July 15, 2009         Plaintiff's grievance of July 13, 2009, was rejected for failure
                      to attach a Concern Form and for having exhausted this issue
                      when he filed his June 3, 2009 grievance at ISCI (Dkt. 114-3,
                      p.1.)

Aug. 4, 2009          PA O'Connor re-ordered x-rays for Plaintiff's left elbow upon
                      realizing the ICC nurse failed to enter the July 6, 2009 request
                      for x-rays (Dkts. 108, p.37; 107-6, p.7; 107-8, p.2.)

Aug. 6, 2009          X-rays were taken of Plaintiff's left elbow (Dkt. 108, p.19.)

Aug. 20, 2009         Dr. Stander received a copy of third party radiologist report
                      (dated August 14, 2009) summarizing the findings of
                      Plaintiff's August 6, 2009 x-rays (Dkt. 108, p.19.)

Aug. 25, 2009         PA O'Connor re-ordered x-rays of Plaintiff's arm because he
                      did not see the August 14, 2009 radiology report from the
                      previous x-Rays in Plaintiff's medical file (Dkts. 107-6, p.7;
                      108, p.31.)

Aug. 31, 2009         PA O'Connor reviewed the third party radiologist report dated
                      August 28, 2009 regarding Plaintiff's second set of x-rays
                      (*Id.*)

Sept. 3, 2009         PA O'Connor ordered an orthopedic consult regarding
                      Plaintiff's left elbow (Dkt. 108, p.36)

Sept. 6, 2009         Plaintiff submitted a Health Services Request Form (HSR)

**MEMORANDUM DECISION AND ORDER - 13**

complaining that "my arm hurts and I cannot move it" (Dkt. 108-1, p.10.)

| | |
|---|---|
| Sept. 9, 2009 | Consultation Request submitted for Plaintiff's orthopedics consult (Dkt. 108, p.107) |
| Sept. 11, 2009 | Dr. Stander examined Plaintiff in response to the September 6 HSR, noted Plaintiff's frozen left elbow joint and recommended an orthopedic consultation (Dkt. 108, p.47.) |
| Sept. 21, 2009 | The orthopedic consult for Plaintiff set for September 28, 2009, was rescheduled to October 7, 2009 by Boise Orthopedic Clinic (Dkts. 107-1, p.7; 107-15, p.1.) |
| Oct. 7, 2009 | Dr. Darcy Webb, a physician at Boise Orthopedic Clinic, examined Plaintiff and recommended surgery to repair his left elbow (Dkt. 108, pp.102-103.) |
| Oct. 15, 2009 | Dr. Stander examined Plaintiff, noted his frozen left elbow, and planned to review the orthopedic consult (Dkt. 108, p.47.) |
| Oct. 29, 2009 | Boise Orthopedic Clinic faxed the written report of the orthopedic consult to ICC. (Dkt. 108, pp.128-131.) |
| Nov. 3, 2009 | Dr. Stander reviewed the Boise Orthopedic Clinic faxed report. (Dkt. 108, pp.128-131.) |
| Nov. 6, 2009 | Dr. Stander ordered surgery of Plaintiff's left elbow per Dr. Webb's recommendation (Dkt. 108, p.36.) |
| Nov. 10, 2009 | Dr. Stander ordered a second opinion consultation with Dr. Lamey, a hand specialist, per a telephone conversation with Dr. Webb; the appointment was scheduled for December 21, 2009 (Dkts. 107-7, p.11; 108-3, p.12.) |
| Nov. 17, 2009 | Dr. Stander examined Plaintiff and noted that Plaintiff wanted to proceed with the surgery recommended by Dr. Webb; physical therapy before and after the surgery was also discussed (Dkt. 108, p.47.) |

**MEMORANDUM DECISION AND ORDER - 14**

| | |
|---|---|
| Nov. 21, 2009 | Plaintiff submitted an Offender Concern Form to "Medical-Cardona" inquiring about  the physical therapy he would receive following the corrective surgery; Mr. Cardona's response dated November 24, 2009 states that Plaintiff will "receive [sic] a physical therapy consult after surgery . . . [and] Dr. Stander and I have already talked about your coming to medical 3 plus times a week for 'PT'" (Dkt. 107-12, p.37.) |
| Nov. 25, 2009 | Plaintiff called Dr. Webb about his planned surgery; Dr. Webb sent a note to Dr. Stander recommending that Plaintiff get a second opinion by the hand surgeon (Dkt. 108, p.104.) |
| Dec. 21, 2009 | Plaintiff's off-site appointment with hand specialist Dr. David Lamey was cancelled due to a transportation mix-up; it was rescheduled for February 1, 2010 (Dkt. 107-1, p.9.) |
| Feb. 1, 2010 | Dr. Lamey, a hand specialist at Idaho Hand Center, examined Plaintiff's arm and recommended a CT scan prior to surgery (Dkt. 108, pp.105-06.) |
| Feb. 26, 2010 | Dr. Stander reviewed Dr. Lamey's written report and ordered a CT scan of Plaintiff's left elbow (*Id*.; Dkt. 108, p.35.) |
| Mar. 22, 2010 | Plaintiff was transported off-site for a CT scan of his left elbow (Dkt. 108, p.29.) |
| Apr. 1, 2010 | Dr. Stander ordered a follow-up appointment for Plaintiff with Dr. Lamey to evaluate the CT scan and possible surgery (Dkt. 108, p.34.) |
| Apr. 21, 2010 | Plaintiff was transported off-site for a follow-up appointment with Dr. Lamey, who recommended surgery but thought "it would be best for [Plaintiff] to wait until he is no longer incarcerated . . . because his outcome would be highly dependent on his postoperative management and postoperative therapy. . . . [Plaintiff] seems to understand this. He will plan to contact me when he is no longer incarcerated." (Dkt. 108, p.97.) |

**MEMORANDUM DECISION AND ORDER - 15**

| May 5, 2010 | Dr. Stander reviewed Dr. Lamey's written consultation report and noted that Dr. Lamey recommended doing the surgery after Plaintiff gets out of prison (Dkt. 108, p.44.) |
|---|---|
| May 6, 2010 | PA Lambert examined Plaintiff and noted that he is "beginning to show disuse and atrophy of biceps and triceps as well as deltoid muscle" and had "concern for nonrecoverable biceps/triceps lean mass if surgery delayed for 3 years." Under the "Plan" portion of the SOAP notes,[6] there is a reference to Dr. Stander, but it is illegible. (Dkt. 108, p.44.) |

The record contains no medical records, HSRs or grievances beyond May 6, 2010, so there is no evidence whether Dr. Stander continued to provide medical treatment to Plaintiff after May 5, 2010, or whether Plaintiff made any additional requests to have the surgery while still incarcerated. Plaintiff was released from prison in September 2012. (Dkt. 107-1, p.1.)

**3.      Preliminary Evidentiary Issues**

Because the parties' Motions to Strike and Defendant Amos's hearsay objection affect the supporting evidence submitted for consideration by the Court with the pending Motions for Summary Judgment, the Court first will address the evidentiary issues.

**A.      *Plaintiff's Motion to Strike (Dkt. 109)***

Plaintiff filed a Motion to Strike certain paragraphs of the Declarations of Defendants Dr. Klint Stander (Dkt. 107-7, ¶¶ 26-28, 53) and PA Rory O'Connor (Dkt. 107-6, ¶¶ 13, 21), arguing they constitute expert testimony that was not adequately

---

[6] The SOAP note (an acronym for subjective, objective, assessment, and plan) is a common method of documentation employed by health care providers to write out notes in a patient's chart.

disclosed in accordance with the requirements of Federal Rule of Civil Procedure 26(a)(2)(C).[7] (Dkt. 109-1, pp.1-2.) In addition, the portions of Dr. Stander's Declaration that contain his "reasonability" opinions should be stricken because they do not satisfy the requirements of Federal Rule of Evidence 702. (*Id.*, pp.3-4.)

Dr. Stander and PA O'Connor maintain that, since they were both "treating physicians" for Plaintiff, their testimony is admissible as fact witnesses and should not be considered expert witness testimony. According to Defendants, requiring a report under Rule 26(a)(2)(B) is not necessary because the "paragraphs in question simply reference the process Defendants O'Connor and Stander underwent in examining, diagnosing, and establishing reasonable treatment options for Plaintiff's medical condition." (Dkt. 122, p.3.) Additionally, Defendants' initial disclosures notified Plaintiff of the general testimony they would be providing;[8] Plaintiff did not object to the adequacy of these initial disclosures (until he filed the pending Motion to Strike), nor did he serve any discovery on these Defendants to ascertain the diagnoses and treatment they would testify

---

[7] Rule 26(a)(2)(C) provides:

"Unless otherwise stipulated or ordered by the court, if the [expert] witness is not required to provide a written report, this disclosure must state: (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."

[8] In their Initial Disclosure Statement, Defendants provided the names of all of Plaintiff's treating physicians, including Dr. Stander and PA O'Connor, and stated that these individuals "may testify concerning their care provided, their examination of the Plaintiff, the Plaintiff's prognosis, the case of the Plaintiff's complaints, pre-existing conditions, post accident injuries, past medical expenses, future medical expenses, the need for any future medical care, and the subject matter of the Plaintiff's medical records." (Dkt. 109-3, p.4.)

**MEMORANDUM DECISION AND ORDER - 17**

that they provided to Plaintiff. (*Id.*, p.10.)

In general, a treating physician is a percipient witness of the treatment he or she rendered. *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 824 (9th Cir. 2011). In a well-reasoned case on this subject, *Mangla v. University of Rochester*, 168 F.R.D. 137, 139 (W.D.N.Y. 1996), the district court delineated the differences between a medical professional testifying as a fact witness and one as an expert witness:

> Treating physicians . . . testifying to their personal consultation with a patient are not considered expert witnesses pursuant to Fed.R.Civ.P.26(b)(4)(C). *Baker v. Taco Bell Corp.*, 163 F.R.D. 348 (D.Colo.1995) (holding that two doctors who treated an accident victim were ordinary witnesses testifying as to their personal treatment of the patient). *See also Salas v. United States*, 165 F.R.D. 31 (W.D.N.Y.1995) (holding that five doctors called to testify regarding their treatment and "opinions with respect to the injuries or illnesses sustained as they causally relate to this incident and his/her opinion as to permanency" were not subject to the more extensive expert witness requirements of Fed.R.Civ.P.26(a)(2)(B)). Experts are retained for purposes of trial and their opinions are based on knowledge acquired or developed in anticipation of litigation or for trial. A treating physician's testimony, however, is based on the physician's personal knowledge of the examination, diagnosis and treatment of a patient and not from information acquired from outside sources. *Baker*, 163 F.R.D. at 349.

168 F.R.D. at 139. Although some circuits have held that treating physicians are experts that must be properly disclosed under Federal Rule 26, *see, e.g.*, *Musser v. Gentiva Health Servs.,* 356 F.3d 751, 756 n.2 (7th Cir. 2004), the Ninth Circuit has not. *See Hoffman v. Lee*, 474 Fed. Appx. 503, 505 (9th Cir. 2012) (unpublished). Indeed, district courts in the Ninth Circuit have reached conclusions similar to that of the *Mangla* court. *See Tracey v. Am. Family Mut. Ins. Co.*, 2010 WL 3808694, *5 (D. Nev. 2010)

**MEMORANDUM DECISION AND ORDER - 18**

(unpublished) (plaintiff could ask his treating physicians questions about the diagnostic tests they performed and the cause of Plaintiff's back pain and treatment because they were witnesses testifying as to the facts of their examination, diagnosis and treatment of the patient; these opinions did not make them expert witnesses); *Johnson v. City of Seattle*, 2004 WL 5495251, *2 (W.D. Wash. 2004) (unpublished) (treating physicians' testimony, based on examinations, diagnosis and treatment of plaintiffs, was based on personal knowledge and was therefore not "expert" testimony).

This Court agrees with the reasoning and conclusions of the *Mangla* court. After careful review of the disputed paragraphs of the Declarations of Dr. Stander and PA O'Connor, the Court finds that the contents therein are based on their contemporaneous treatment of Plaintiff and are thus admissible as fact witness testimony. Paragraph 13 of PA O'Connor's Declaration contains his subjective opinion about Plaintiff's injury and the possible treatment options available to Plaintiff as a result of his contemporaneous treatment of Plaintiff. Similarly, Paragraph 21 of PA O'Connor's Declaration is a summary of the medical treatment O'Connor provided to Plaintiff, which is well within the purview of fact witness testimony. Finally, the paragraphs at issue in Dr. Stander's declaration summarize Plaintiff's injury, the possible treatment options, and the timing of Dr. Stander's and PA O'Connor's diagnosis and treatment decisions based on facts available to them at the time they contemporaneously treated Plaintiff.

Dr. Stander's opinion as to the reasonableness of PA O'Connor's medical treatment of Plaintiff in paragraph 28 is permissible in the context of Dr. Stander's duties

**MEMORANDUM DECISION AND ORDER - 19**

as PA O'Connor's supervising physician at the time. (Stander Decl., ¶ 3 (Dkt. 107-7, p.2)). The remaining disputed paragraphs–26, 27 and 53–are based on Dr. Stander's personal knowledge of his contemporaneous treatment of Plaintiff as his treating physician, and thus will not be stricken as undisclosed expert testimony. Plaintiff's Motion to Strike will therefore be denied.

### B. *Defendants' Motion to Strike Paragraph Six of the Affidavit of Dustin Lancaster (Dkt. 118)*

Defendants Stander and O'Connor move to strike paragraph six of Plaintiff's Affidavit, alleging that the statements constitute a sham affidavit by contradicting his prior deposition testimony. In March 2012, Plaintiff testified at his deposition that he received a written response to an Offender Concern Form dated November 21, 2009, from Mr. Cardona (to whom he had submitted the Concern Form and who was the ICC Health Services Administrator at the time) wherein he was told that "once [he] had surgery, [he] would receive a consult with the physical therapist and they would arrange for physical therapy three times a week." (Dkt. 107-12, p.18.) Prior to that statement, however, Dr. Stander had told Plaintiff that he would not be able to see a licensed physical therapist because "it's to[o] complicated to get an inmate to a physical therapist a couple times a week and he can't get it approved, he's tried before with other inmates." (Dkt. 123-2, p.2.) Instead, Dr. Stander told Plaintiff that he would work with him. (Dkt. 123-1, p.2.)

Then in Dr. Stander's Declaration filed in support of his motion for summary judgment, Dr. Stander amended and clarified what he told Plaintiff in November 2009 and explained that if a surgeon required formal physical therapy following surgery, he

**MEMORANDUM DECISION AND ORDER - 20**

would have submitted an order for a "formal physical therapy consultation" to the
Regional Medical Director for approval, and if approved, ICC would have contracted
with a physical therapist to come to ICC and work with Plaintiff. (Dkt. 107-7, p.12.) In
response to this information provided by Dr. Stander, Plaintiff stated the following in
paragraph 6 of his Affidavit:

> I have read in Dr. Stander's declaration that if physical therapy and
> rehabilitation were required, he could have ordered that and had it provided
> at ICC. If I knew and understood that the physical therapy and rehabilitation
> could have [sic] provided at ICC, I would have had the surgery.

(Lancaster Affidavit, ¶ 6 (Dkt. 114, pp.3-4)). Defendants contend that this contradictory
testimony is an improper attempt to create an issue of fact to preclude summary judgment.
*Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). Plaintiff argues,
however, that his conflicting statements about whether he knew he would receive formal
post-operative physical therapy are not a sham, but "merely reflect different views by
[Plaintiff] at different times based on different underlying factual understandings." (Dkt.
123, p.2.)

    In situations such as this, the Court must make a factual determination whether the
contradiction is actually a "sham." *Kennedy*, 952 F.2d at 266-67. Here, the record shows
that Plaintiff did, at different times, receive inconsistent information regarding the type
and availability of post-surgery physical therapy that would be provided to him at ICC.
Plaintiff's statement in paragraph 6 of his Affidavit merely provides a response to Dr.
Stander's amended statement in his Declaration that Dr. Stander *would* have submitted a
request for post-operative formal physical therapy, and an explanation for why Plaintiff's

**MEMORANDUM DECISION AND ORDER - 21**

prior statements differ from that response. Explanations and clarifications such as these are permissible and do not constitute a "sham" affidavit. *See Messick v. Horizon Indus. Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995) ("[T]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit."). Accordingly, Defendants' Motion to Strike will be denied, and paragraph six of Plaintiff's Affidavit will not be stricken.

C.   ***Defendant Amos's Motion to Strike Paragraphs Five and Six to the Affidavit of Dr. Paul Collins Filed August 1, 2013 (Dkt. 120)***

Defendant Amos requests that this Court strike paragraphs five and six of the Affidavit of Dr. Paul Collins, where he opines that any reasonable medical provider would have recognized the need for and provided post-surgery physical therapy. She argues that no foundation has been provided for these opinions, the expert testimony was not disclosed pursuant to Federal Rule 26(a)(2), and the testimony is irrelevant to establish Ms. Amos' deliberate indifference. (Dkt. 120, pp.1-2.) Defendants O'Connor and Stander filed a joinder in this Motion as well. (Dkt. 121.) Because the Court has not relied upon the contested paragraphs to determine the Motions for Summary Judgment, the Court will deny the motion as moot.

D.   ***Defendant Amos's Objection to Plaintiff's Evidentiary Submission***

Defendant Amos also objects to Plaintiff's submission of the June 3, 2009 grievance containing Director of Nursing Donaldson's report of Ms. Amos's purported

statement that Plaintiff had been scheduled with and had seen an on-site physical therapist at ISCI. (Dkt. 114-1, p.1.) Ms. Amos contends that the submission is double hearsay and inadmissible.

Hearsay is defined as an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801. Hearsay evidence is not admissible unless it falls within an exception set forth by federal statute, the Federal Rules of Evidence, or another rule prescribed by the Supreme Court. Fed. R. Evid. 802. "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statement conforms with an exception to the rule." Fed. R. Evid. 805.

Medical and prison grievance records, although hearsay, may be admissible under the business records exception to the hearsay rule. Fed. R. Evid. 803(6). That exception renders admissible records of an "act, event, condition, opinion, or diagnosis . . . made at or near the time by—or from information transmitted by—someone with knowledge," and if the records are "kept in the course of a regularly conducted business," and it was the regular practice of that business to make the record." *Id*. The records must be accompanied by a certification from the custodian of records attesting to their authenticity. Fed. R. Evid. 902(11). If an objection to admissibility occurs at the summary judgment stage, parties are required to demonstrate only that they will be able to produce the evidence in an admissible form at trial. Fed. R. Civ. P.56(c)(2).

While the Ninth Circuit Court of Appeals has not specifically addressed whether prison records are considered business records, the Seventh Circuit Court of Appeals has

**MEMORANDUM DECISION AND ORDER - 23**

concluded that prison institutional records are business records that fall within the

exception to hearsay in Rule 803(6). This viewpoint is well-reasoned, as explained in

*Cobb v. Knode*, 2010 WL 3608814 (D.S.D. 2010) (unpublished):

> "A prison is clearly a business within the meaning of the term in the statute
> and the rule, and inasmuch as the memorandum was prepared by a member
> of the staff at [the prison] and was lodged in the official prison files, we
> conclude that it was made in the regular course of prison activity. The fact
> that the memorandum was retained as part of plaintiff's prison file indicates
> that it is the type of document routinely relied upon by prison officials."
> *Stone v. Morris*, 546 F.2d 730, 738 (7th Cir. 1976). Addressing the
> argument that such documents lacked trustworthiness because the source
> was not known, the Court noted such arguments should go to the weight
> accorded to the document, not its admissibility. *Id.* at 738-39. *Accord,
> Moffet v. McCauley*, 724 F.2d 581, 584 (7th Cir.1984). "The prison official
> who prepared the report had a business duty and a public obligation to be
> accurate . . . It is clear that the report does have circumstantial guarantees of
> trustworthiness sufficient to meet the trustworthiness requirement . . . .
> Under these circumstances, we think that the lack of more specific
> information concerning the preparation of the report more properly goes to
> its weight than its admissibility." *Id.*

*Id.* at *3 (first and second alterations in original).

The specific document and statement to which Ms. Amos objects include the

prison grievance dated June 3, 2009, and the purported statement of Ms. Amos contained

in the grievance response from ISCI. (Dkt. 114-1, p.1.) In the grievance, Director of

Nursing Donaldson wrote: "I talked to Kat Amos who is our off site scheduler and she

tells me you [Plaintiff] were scheduled and seen by our Physical Therapy staff on site."

(*Id.*)

As to the first level of hearsay, the Court agrees that the grievance form itself is

hearsay if it is being used to prove the truth of the matter asserted. Plaintiff asserts in his

**MEMORANDUM DECISION AND ORDER - 24**

response to the pending motion for summary judgment that this grievance shows that Ms.

Amos failed to schedule *off-site* physical therapy. This can be viewed two ways: if

Plaintiff is trying to have the jury draw the inference that Ms. Amos failed to schedule

off-site physical therapy because the note says "on-site" and no on-site physical therapy

existed, then that inference does go to the truth of the matter, and it is hearsay. *See Orr v.*

*Bank of America, NT & SA*, 285 F. 3d 764, 779 n.26 (9th Cir. 2002) ("Although [the

evidence] was not offered to prove the truth of the matter asserted, it [was] nonetheless

hearsay[,]" because the inference counsel sought to draw "depend[ed] on the truth of [the

third party's] statement . . . ."). However, the grievance is admissible because it is a

business record. The possibility that Donaldson, who was Ms. Amos's supervisor, may

have fabricated this statement to protect herself, Ms. Amos, or the employer, goes to

weight and not to admissibility, nor does it go to trustworthiness. *See Stone*, 546 F.2d at

738-39; *Moffet v. McCauley*, 724 F.2d at 584 (cited in *Cobb v. Knode*, 2010 WL

3608814, at *3).

On the other hand, if Plaintiff is trying to use the grievance to help prove that Ms.

Amos's statement is false—that Ms. Amos did not, in fact, schedule Plaintiff for on-site

or any type of physical therapy—then it is not hearsay, because Plaintiff is not using it to

prove the truth of the matter asserted. *See Anderson v. United States*, 417 U.S. 211,

219–20 (1974). Either way, the grievance is admissible.

As to the second level of hearsay, the Court concludes that the statement of

Donaldson within the grievance is admissible because the statement of Ms. Amos is an

**MEMORANDUM DECISION AND ORDER - 25**

admission offered against Ms. Amos, and it is not hearsay. Federal Rule of Evidence 801(d)(2)(A) provides that a statement is not hearsay if it is offered against a party and is "the party's own statement, in either an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A).

Plaintiff must show at this point only that he can produce a custodian's certification or testimony at trial to lay foundation for the grievance, and that he can produce Donaldson at trial to lay foundation for the Amos statement within the grievance. These witnesses are listed on Plaintiff's List of Witnesses. Therefore, because Plaintiff has met his burden to show that he can provide authentication and foundation at trial, the statement is admissible for purposes of consideration on summary judgment.

## 4.     Defendant Amos's Motion for Summary Judgment (Dkt. 106)

Ms. Amos asserts entitlement to summary judgment based on Plaintiff's inability to bring forward sufficient evidence from which a jury could infer that Ms. Amos acted with *deliberate indifference* to Plaintiff's serious medical needs. Ms. Amos declares that she never knew of Plaintiff or his need for physical therapy (Amos Affidavit, Dkt. 106-3, ¶ 7), and, even if she had received requests to schedule physical therapy for Plaintiff, she "would not have known of the potential harm that may befall [Plaintiff] if he was not scheduled for physical therapy or for assessment by an orthopedist, as [she is] not a nurse, therapist, or physical, and as [she is] not educated, trained, or licensed to diagnose or treat patients." (Amos Aff., Dkt. 106-3, ¶ 11.)

**MEMORANDUM DECISION AND ORDER - 26**

In response, Plaintiff argues:

> Ms. Amos understood that she was being provided consultation requests for prisoners' medical care. She understood that [she] needed to forward those to the Regional Medical Director for prisoners to get that care. She received Mr. Lancaster's consultation requests. All of these facts establish the sufficient awareness of the risk to Ms. Amos that if she did not deliver or process Mr. Lancaster's consultation requests, he would not receive the care that he needed. She need not necessarily understand the ultimate degree of harm that would fall to Mr. Lancaster, just that he would be harmed.

(Dkt. 110, p.7.)

It is undisputed that Ms. Amos's position at ISCI as the off-site scheduler was purely administrative—she did not provide any medical care whatsoever to any inmates. In her position, she did not meet, diagnose, or treat inmates; nor could she herself authorize or order off-site or on-site consultations. Rather, Ms. Amos was merely the clerical conduit between the ISCI medical providers, who submitted consultation requests for an inmate, and the Regional Medical Director, who determined whether to approve the consultation requests.

Plaintiff is not asserting, however, that Ms. Amos's job was to diagnose or treat Plaintiff's elbow problems. Rather, Plaintiff argues that Ms. Amos's job was to route the consultation requests to the Regional Medical Director in a timely manner, so that Plaintiff could obtain the physical therapy and orthopedic consultation that PA Takagi had deemed necessary for the proper healing of his elbow after surgery. Consultation requests that would come to Ms. Amos, by their very nature, were for no other purpose than to address serious medical needs of inmates. Ms Amos declared  by affidavit that her

**MEMORANDUM DECISION AND ORDER - 27**

"involvement would begin after a medical provider assessed an inmate and determined that an offsite consultation was medically necessary." (Amos Aff., Dkt. 106-3, ¶ 5.)

This is an "obviousness" argument, centering on ignorance or interference with a need for medical care claim, arising from case law such as *Gibson v. County of Washoe*, 290 F.3d 1175 (9th Cir. 2002), and *Lolli v. County of Orange*, 351 F.3d 410 (9th Cir. 2003).[9]

"[D]eliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant *actually knew* of a risk of harm." *Lolli*, 351 F.3d at 410 (citations omitted) (emphasis added). In *Lolli*, the plaintiff contended that he told the officers that he was a diabetic and needed food—an allegation of fact from which a jury could conclude that officers knew of a substantial risk of serious harm. The court concluded that "Lolli's extreme behavior, his obviously sickly appearance and his explicit statements that he needed food because he was a diabetic could easily lead a jury to find that the officers consciously disregarded a serious risk to Lolli's health." *Id*. at 421.

If a defendant should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk. *Jeffers v. Gomez*, 267 F.3d 895, 914 (9th Cir. 2001). But if facts exist from which a jury could infer that a defendant *is* aware of a substantial risk of serious harm, a person may be liable for

---

[9] *See also Toguchi*, 391 F.3d at 1057 n.4 (noting that an obviousness argument was not made by the Toguchis).

**MEMORANDUM DECISION AND ORDER - 28**

neglecting a prisoner's serious medical needs on the basis of either her action or her inaction. *Farmer*, 511 U.S. at 842 ("Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.").

For deliberate indifference to be established, there must be a purposeful act or purposeful failure to act on the part of the defendant and resulting harm. *See McGuckin*, 974 F.2d at 1060. "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." *Id*. There also must be a resulting harm from the defendant's activities. *Id*. The needless suffering of pain may be sufficient to demonstrate further harm. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002).

Although the deliberate indifference doctrine contains a heightened foreseeability requirement, this requirement differs from the traditional negligence foreseeability requirement only insofar as deliberate indifference requires the defendant to be subjectively aware that serious harm is likely to result from a failure to provide medical care. The deliberate indifference doctrine does not require that a particular consequence be more predictable than is required under traditional tort law. *Gibson v. County of Washoe*, 290 F.3d 1175, 1193 (9th Cir. 2002).

In *Gibson*, the plaintiffs' decedent, who suffered from a severe mental illness, was arrested with his supply of prescription medications; he later exhibited bizarre behavior

**MEMORANDUM DECISION AND ORDER - 29**

and was restrained in such a manner that he suffered a heart attack and died as a result of

an unknown heart condition that was exacerbated by the stress of the way he was

restrained. 290 F.3d at 1181-83. The court found that the following allegations were

sufficient for the plaintiff to proceed to the jury on the question of the nurse's deliberate

indifference:

> A jury could find that the nurse knew that Gibson was in the throes
> of a manic state on the basis of three facts: she had medical training, she
> knew that Gibson was exhibiting behavior consistent with mental illness,
> and she knew that Gibson possessed psychotropic medication "that would
> stabilize somebody." A jury could also conclude that a trained nurse would
> know that hospitalization could have relieved Gibson's condition, and that if
> Gibson remained in jail, he presented a danger both to himself and to
> others. If the nurse knew that a substantial risk to Gibson's health existed
> and she declined to act upon this knowledge, she was deliberately
> indifferent to Gibson's constitutional right to receive medical care.

*Id.* at 1194.

However, as to deputies who took control of the decedent after those deputies who

had arrested him withdrew from the situation, the court found there was not enough

evidence to show that they knew of the risk:

> In short, all the deputies at the jail knew about Gibson's mental
> condition was what they could observe of his behavior. Although several
> remarked on his peculiar mood swings and dramatic shifts from
> combativeness to compliance, there is no evidence that any of them actually
> knew that this behavior connoted serious, treatable mental illness. Nor can
> we say that Gibson was so obviously mentally ill that the deputies, who had
> received no training regarding the diagnosis and treatment of mental illness,
> must have known that Gibson was exhibiting symptoms of mental illness.
> The lapses in communication at the jail are hardly commendable, but the
> deputies who, because of these lapses, remained unaware of Gibson's
> mental condition cannot be held liable for having been "deliberately
> indifferent" to it. *See Farmer*, 511 U.S. at 838, 114 S.Ct. 1970.

**MEMORANDUM DECISION AND ORDER - 30**

*Id*. at 1197.

The facts of this case applicable to the claim against Ms. Amos fall somewhere between the nurse in *Gibson*, whose summary judgment motion was denied, and the officers in *Gibson*, whose summary judgment motion was granted. Construing the inferences in favor of Plaintiff, as the Court must at this stage, the Court finds there is enough evidence from which a jury could conclude that Ms. Amos knew of Plaintiff's need for physical therapy and ignored the requests from Plaintiff's health care providers for it. The reasoning for this conclusion follows.

It is undisputed that it was Ms. Amos's usual and customary business practice to put her initials, date, and stamp on a provider's consultation request form when she had forwarded it to the Regional Medical Director, as a way of keeping track of which requests were sent and outstanding. It is undisputed that the two consultation requests for Plaintiff that were to be forwarded to the Regional Medical Director do not bear Ms. Amos's initials, date, and stamp.

It is undisputed that it was Ms. Amos's usual and customary business practice to schedule an off-site appointment if the Director approved the consultation request, or to send the denial back to the requesting medical provider if the Director did not approve the request. There is no evidence in the record showing whether the two consultation requests for Plaintiff from his provider were ever forwarded to or reviewed by the Regional Medical Director, and neither a physical therapy nor an orthopedic surgeon follow-up appointment was scheduled for Plaintiff before he was transferred. Ms. Amos's testimony

**MEMORANDUM DECISION AND ORDER - 31**

that she never met or spoke to Plaintiff while he was incarcerated at ISCI is undisputed; therefore, Plaintiff must show Ms. Amos's knowledge of Plaintiff's need for physical therapy via a paper trail.

Plaintiff disputes Ms. Amos's contention that she did not receive the consultation requests or Dr. Boyea's letter, and the Court concludes that there is a genuine dispute of material fact as to whether Ms. Amos received these items. Pursuant to Ms. Amos's job description, Ms. Amos was to "log[] requests for off-sites and diagnostic studies," to "coordinate[] scheduling of on-site speciality appointments (e.g., x-ray, physical therapy, medical-surgical subspecialities), and "maintain[] roster or appointment book based on scheduled appointments, both off-site and on-site, as needed." (Dkt. 88, p.5.)

The first consultation request, which is specifically for physical therapy, bears a notation by "S.V." (presumably LPN S. Voorstead) that it was routed to "K. Amos." PA Takagi wrote on the consultation request: "Physical Therapy x 1 w/ in cell exercise instruction." (Dkt. 108, p.117.) At the top of the request, both the "off-site" and the "on-site clinic" boxes are checked, with the clarifying note, "whichever available sooner." Corroborating the routing is another medical record, a Physician's Orders Notation, which similarly shows, "Pt referal [sic] – to K. Amos," signed by LPN S. Voorstead. (Dkt. 108-2, p.4.) These documents do not show that Ms. Amos did, in fact, receive the consultation request, but two separate references in medical records that it was sent to her raises a genuine dispute of fact as to whether she received it.

**MEMORANDUM DECISION AND ORDER - 32**

The second consultation request, which is specifically for an orthopedic surgeon appointment, does not bear a note on it that it was sent to anyone by anybody. Similarly, the Physician's Order Notation that corresponds to the same day of treatment does not bear a note that it was sent to anyone by anybody. However, an unknown person made a notation in the "order is noted" section of the Physician's Order Notation and signed it. This does not clearly show that Ms. Amos received the consultation request or that it was sent to her, but the record, together with the fact that the job description makes Ms. Amos the intended recipient of such requests at ISCI (Dkt. 88),[10] raises a genuine dispute of fact.

Dr. Boyea's May 22, 2009 letter—discussing the need for an orthopedic follow-up appointment and mentioning that physical therapy should have been in place by that time—is specifically addressed to "Kat – IDOC." It appears to have been faxed to the prison medical unit. There is no evidence in the record showing where or how this letter was received, but, because it was addressed to "Kat," and Ms. Amos's job description shows that she was in charge of keeping logs and rosters or appointment books of off-site requests and appointments (*see* Dkt. 88), there is a genuine dispute of material fact as to whether Ms. Amos saw and read the letter.

The final piece of evidence Plaintiff has produced is a grievance he wrote on June 3, 2009, which was answered on July 5, 2009 by Ms. Amos's supervisor,[11] Director of

---

[10] Plaintiff's proposed amended complaint, which was deemed untimely, alleges that "Defendant Amos and/or Defendant Dolan failed to schedule Plaintiff for therapy." (Dkt. 83-1, p.5.) It is unclear from the record who Tom Dolan is or what role, if any, he may have played in scheduling.

[11] *See* Ms. Amos's job description, showing that the Director of Nursing supervised that position, in CMS's production of documents and information pursuant to a subpoena duces tecum. (Dkt. 88, p.3,

MEMORANDUM DECISION AND ORDER - 33

Nursing J. Donaldson:

>  You were moved to the ICC Facility and your medical issues should be
> addressed by the staff there. I talked to Kat Amos who is our off-site
> scheduler and she tells me you were scheduled and seen by our Physical
> Therapy staff on site. If you are continuing to have problems please ask the
> Medical Staff at ICC to address your needs.

(Dkt. 114-1, p.1.)

It is undisputed that, "[i]f physical therapy was approved in 2009, the offender would have gone off-site to see a therapist since it was not offered at ISCI at that time." (Dkt, 88, p.3.) Ms. Amos questions the content of this grievance response, saying that she knows Plaintiff could not have received any physical therapy because a consultation request was never signed or stamped, and there were no on-site physical therapists at ISCI at that time. (Dkt. 106-3, ¶¶ 12-13.) However, the fact remains that there is a writing from Donaldson, Ms. Amos's supervisor, saying that Ms. Amos stated that Plaintiff's need for physical therapy had been addressed by a scheduled physical therapy visit with an on-site physical therapy staff person—which is either the reporting of an impossibility or a major miscommunication. The Court agrees with Plaintiff that this report of Ms. Amos's purported comments raises a genuine dispute of material fact as to whether Ms. Amos knew of the consultation request and Plaintiff's need for physical therapy, and whether she purposely ignored the request or the need by reporting something that was untrue.

These facts may add up to nothing more than a series of mistakes and miscommunications that Ms. Amos and others can explain at trial, but such must be a

---

5.)

**MEMORANDUM DECISION AND ORDER - 34**

question resolved based on evidence and determining the witnesses' credibility. At this stage, all inferences must be drawn in favor of Plaintiff. For all of the reasons set forth above, the Court concludes that Ms. Amos is not entitled to summary judgment, and Plaintiff may proceed to trial on his deliberate indifference claim against her.

The claim for punitive damages will be reserved for trial. If there is insufficient evidence to support such a claim after Plaintiff has presented his evidence, Ms. Amos is not precluded from moving for judgment as a matter of law under Federal Rule of Civil Procedure 50.

**4.     Defendants Stander and O'Connor's Motion for Summary Judgment (Dkt. 107)**

Plaintiff alleges that, after his transfer, Dr. Stander and PA O'Connor were deliberately indifferent to his serious medical needs. Defendants Stander and O'Connor have filed a Motion for Summary Judgment asserting that there is no genuine dispute of material fact concerning the propriety of the medical care and treatment they provided to Plaintiff while housed at ICC. (Dkt. 107-2, p.2.) For the reasons that follow, the Court will grant summary judgment for PA O'Connor and deny summary judgment for Dr. Stander.

For purposes of this summary judgment motion, the Defendants acknowledge, and the Court will assume, that Plaintiff's elbow contracture is a serious medical need (*See* Dkt. 107-2, pp.17-18). As a result, the Court need only address Defendants O'Connor and Stander's alleged deliberate indifference. This requires Plaintiff to demonstrate that each of these Defendants knew of and disregarded an excessive risk to his health and safety.

MEMORANDUM DECISION AND ORDER - 35

*See Gibson*, 290 F.3d at 1187.

### A.    *PA O'Connor*

PA O'Connor provided medical care and treatment to Plaintiff between July 6, 2009[12], and September 3, 2009. When PA O'Connor first examined Plaintiff on July 6, 2009, he noted the flexion contracture in Plaintiff's left arm "due to delay in [physical therapy] to work on [range of motion] following surgery." (Dkt. 108, p.48.) PA O'Connor then indicated he would "take 3 view x-ray of left elbow to assess healing, consult with orthopedics and attempt to set up PT to try and improve ROM." (*Id.*) In his declaration, PA O'Connor explains that a patient with elbow contracture is "not an obvious candidate for surgery or physical therapy . . . there could have been multiple reasons why [Plaintiff] was unable to move his arm . . . [which would] make physical therapy inadvisable, and therefore, it was necessary to rule out these more serious conditions." (Dkt. 107-6, pp.5-6.) Accordingly, PA O'Connor decided to first take x-rays and then follow up with an orthopedic specialist to obtain a prior diagnosis. (*Id.*)

Plaintiff's x-rays were not taken until August 6, 2009, shortly after PA O'Connor received Plaintiff's medical file from ISCI, reviewed it, and realized that Plaintiff's x-rays had not yet been completed. (*Id.*, pp.6-7.) There is no evidence that the unintentional one-

---

[12]Plaintiff was transferred to ICC on June 18, 2009, but his medical file was not transferred until the first week in August 2009. The two Intrasystem Transfer Forms completed by ISCI medical staff on June 17, 2009 did not indicate Plaintiff had any current treatments, consultations scheduled, or that any follow-up care was needed. (Dkt 108-4, pp.1-2.) In addition, the ICC nurse who completed Plaintiff's Initial Health Screening Form on June 18, 2009 noted his left elbow contracture, but did not alert Defendants O'Connor or Stander that any continuing treatments were required. As a result, Plaintiff was not seen by PA O'Connor until July 6, 2009, after he submitted an HSR Form complaining of blood in his urine.

**MEMORANDUM DECISION AND ORDER - 36**

month delay in taking Plaintiff's x-rays was the result of PA O'Connor's action or inaction; rather, the ICC nurse responsible for electronically entering PA O'Connor's July 6 order for x-rays inadvertently failed to do so, and did not notify Defendants Stander or O'Connor of her mistake. (Dkt. 107-8, p.2.) Plaintiff then submitted two Offender Concern Forms on August 13 and August 21, 2009, inquiring about the x-ray results. (Dkt. 107-12, pp.35-36.) When PA O'Connor did not see a radiology report in Plaintiff's medical file,[13] he re-ordered another set of x-rays on August 25, 2009 "out of an abundance of caution." (Dkt. 107-6, p.7.) The radiology report for the second set of x-rays was prepared the same day as the x-rays were taken, and PA O'Connor reviewed the report on August 31, 2009. Then on September 3, 2009, he ordered an orthopedic consultation to evaluate Plaintiff's left elbow contracture. (Dkt. 108-3, p.9.) After completing that consultation order, PA O'Connor's employment at ICC ended on September 24, 2009.

In the two month time period that PA O'Connor provided medical care to Plaintiff, he initially examined Plaintiff's elbow contracture, ordered a set of x-rays, and when he did not see the radiology report within three weeks of the x-rays being taken, he ordered another set of x-rays "out of an abundance of caution." PA O'Connor read the radiology report six days after it was prepared, and four days later ordered an orthopedic consultation for Plaintiff's elbow contracture.

---

[13]The radiology report from the first set of x-rays was dated August 14, 2009 and Dr. Stander's initials with the date "8-20-09" are noted on the report, indicating it was received and/or reviewed by Dr. Stander, but apparently the report was not yet included in Plaintiff's medical file.

MEMORANDUM DECISION AND ORDER - 37

Plaintiff argues that PA O'Connor's decision to order x-rays himself—rather than sending Plaintiff directly to an orthopedic specialist who could order the x-rays and thus expedite treatment of Plaintiff's elbow—was a time-consuming delay and that PA O'Connor "disregarded a known risk with a limited time window" to properly respond to Plaintiff's need for corrective surgery. (Dkt. 112, p.5.) This decision, Plaintiff asserts, "certainly raise[s] a question of deliberate indifference by [Defendant] O'Connor." (*Id.*)

Having carefully reviewed the entire record and the undisputed facts pertaining to the medical care PA O'Connor provided to Plaintiff, the Court disagrees with Plaintiff's assertion that PA O'Connor's initial decision to order x-rays himself raises a genuine dispute of fact as to PA O'Connor's deliberate indifference. "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

When PA O'Connor first examined Plaintiff on July 6, 2009, Plaintiff's medical records had not yet been transferred from ISCI, so he was unable to ascertain the cause of the elbow contracture or how to properly treat it. Indeed, PA O'Connor states that x-rays were "crucial to properly treating his medical condition" (Dkt. 107-6, p.5), and Dr. Stander agreed that "it was reasonable to request updated x-rays and wait for those x-rays before further treatment decisions were made . . . ." (Dkt. 107-7, p.7.) Though there were

**MEMORANDUM DECISION AND ORDER - 38**

some inadvertent delays in obtaining the x-rays and radiology results of Plaintiff's elbow, they were not the fault of PA O'Connor.

Further, PA O'Connor's decision to order a second set of x-rays demonstrates his concern and endeavor to treat Plaintiff's serious medical condition, not disregard it. These facts do not show that PA O'Connor's chosen course of treatment was medically unacceptable under the circumstances, nor that PA O'Connor consciously disregarded a serious of risk harm to Plaintiff. Accordingly, summary judgment will be granted for PA O'Connor.

### B.    *Dr. Stander*

Although Dr. Stander supervised the physicians assistants at ICC, including PA O'Connor, Dr. Stander did not have any direct involvement in Plaintiff's medical care and treatment until he first examined Plaintiff on September 11, 2009 in response to an HSR Form Plaintiff had submitted about his left elbow. At that appointment, Dr. Stander noted that "it is now 5 mo. post repair. No PT was done and he has severe stiffness of LT. elbow, no significant motion there." (Dkt. 108, p.47.) Dr. Stander prescribed pain medication for Plaintiff and recommended an orthopedic consult. (*Id*.; Dkt. 108-3, p.9.)

On October 7, 2009, Plaintiff was transported to his off-site consultation with Dr. Darcy Webb, a physician at Boise Orthopedic Clinic, who examined Plaintiff and recommended surgery to repair his left elbow. (Dkt. 108, pp.102-103.) Dr. Stander reviewed Dr. Webb's report on November 3, 2009, wherein she opined that "formal physical therapy at this point will [not] help" and even with the corrective surgery,

**MEMORANDUM DECISION AND ORDER - 39**

Plaintiff "likely will still have some residual stiffness in the elbow." (*Id*., pp.111-12.) Dr. Webb's report did not mention any limb atrophy or indicate that surgery needed to be done immediately to prevent further, permanent harm. Three days later, Dr. Stander ordered the recommended surgery. However, in a follow-up telephone call with Dr. Webb's office on November 10 about the upcoming surgery, Dr. Stander was told that Dr. Webb wanted Plaintiff to obtain a second opinion from another hand specialist before having the surgery. (Dkt. 107-7, p.11.)

On November 17, 2009, Dr. Stander examined Plaintiff and noted that Plaintiff wanted to proceed with the surgery recommended by Dr. Webb. They also discussed physical therapy before and after the surgery. (Dkt. 108, p.47.) Plaintiff stated that Dr. Stander told him he would not see a physical therapist after surgery because it was too complicated and he had tried before to get it approved without success. Instead, Dr. Stander would work with Plaintiff two to three days a week doing physical therapy. (Dkt. 107-14, p.6.) Four days later, Plaintiff submitted an Offender Concern Form to "Medical-Cardona" inquiring about the physical therapy he would receive following the corrective surgery. Mr. Cardona's response dated November 24, 2009 informed Plaintiff he would "receive [sic] a physical therapy consult after surgery . . . [and] Dr. Stander and I have already talked about your coming to medical 3 plus times a week for 'PT.'" (Dkt. 107-12, p.37.)

Per Dr. Webb's recommendation, Dr. Stander then ordered a second opinion appointment for Plaintiff which was scheduled with Dr. Lamey, a hand specialist, on

**MEMORANDUM DECISION AND ORDER - 40**

December 21, 2009. When Dr. Lamey examined Plaintiff's arm on February 1, 2010, he recommended a CT scan be performed prior to having corrective surgery. (Dkt. 108, pp.105-06.) In February 2010, Plaintiff told Dr. Lamey that he had a maximum of three and a half years remaining on his sentence. (Dkt. 108, p.105.)

Dr. Stander ordered the CT scan on February 26, 2010, after reviewing Dr. Lamey's written report, which did not indicate that Plaintiff was suffering any atrophy of his left arm, or that he would suffer atrophy or permanent harm if surgery was not immediately performed.

On March 22, 2010, Plaintiff was transported off-site for the CT scan of his left elbow. On April 21, 2010, Plaintiff had a follow-up appointment with Dr. Lamey who recommended surgery but thought "it would be best for [Plaintiff] to wait until he is no longer incarcerated . . . because his outcome would be highly dependent on his postoperative management and postoperative therapy. I think it would be difficult or impossible to accomplish a good outcome while he is incarcerated. [Plaintiff] seems to understand this. He will plan to contact me when he is no longer incarcerated." (Dkt. 108, p.97.)

On May 5, 2010, Dr. Stander reviewed Dr. Lamey's April 21, 2010 written consultation report and noted that Dr. Lamey recommended delaying the surgery after Plaintiff was released from prison. (Dkt. 108, p.44.) Dr. Lamey's report did not note whether Plaintiff was suffering any atrophy of his arm, or that delaying the surgery could or would cause atrophy or other permanent harm.

**MEMORANDUM DECISION AND ORDER - 41**

However, on May 6, 2010, PA Lambert examined Plaintiff and noted that Plaintiff was "[b]eginning to show disuse and atrophy of biceps and triceps as well as deltoid muscle" and PA Lambert was concerned for "non-recoverable biceps/triceps lean mass if surgery delayed for 3 years." (Dkt. 108, p.44.) PA Lambert's notes also included a reference to "Dr. Stander," which suggests that PA Lambert intended to discuss the issue with Dr. Stander. (*Id*.) Plaintiff recorded in his journal that PA Lambert told him "he [Lambert] is going to talk to Stander about [the delay in surgery harming his overall muscle mass] and set an appointment for [Plaintiff] to see Stander." (Dkt. 107-14, p.26.)[14]

Dr. Stander argues that Plaintiff has not met his burden to bring forward any evidence showing that PA Lambert actually discussed the issue with Dr. Stander, or that Dr. Stander actually reviewed the note, because it was made one day after Dr. Stander made his final review of Dr. Lamey's recommendation. Counsel for Dr. Stander reasons:

> Assuming that Lancaster provided full disclosure to Dr. Lamey during their consultations, and taking into account the close proximity between Dr. Lamey's April 21, 2010 consultation and Lambert's May 6, 2010 observation, a reasonable inference can be drawn that Dr. Lamey would have also been able to observe any atrophy that Lancaster was experiencing at the time. He did not note anything in his report. Further, Dr. Lamey mentioned in a prior report that he was aware that Lancaster was not going to be released from prison for up to three and a half years, but did not mention any potential permanent harm from waiting to perform surgery. (Dkt. 107-3, Ex. a, ICC Lancaster 123.) Despite Lamey's first hand observations of Lancaster's physical condition as well as this knowledge of Lancaster's remaining prison sentence, Dr. Lamey still chose not [to] recommend surgery until Lancaster was released from prison. Therefore, it is not reasonable to expect Dr. Stander to second-guess or attempt to

_____

[14] Nothing in the record indicates that Plaintiff was seen by Dr. Stander after May 5, 2010, or that Plaintiff requested to have the surgery after this date until he was released from prison in September 2012.

**MEMORANDUM DECISION AND ORDER - 42**

override Dr. Lamey's recommendation based on the observation of a
physician's assistant.

(Dkt. 117, p.10.)

However, the Court finds that Plaintiff has brought forward sufficient evidence
that Dr. Stander was PA Lambert's supervising physician at the time Plaintiff saw PA
Lambert (Stander Aff., Dkt. 107-7, ¶ 3); that a business record exists showing that PA
Lambert intended to discuss the atrophy issue with Dr. Stander; that Plaintiff's journal
entry corroborates that PA Lambert was going to discuss potential permanent muscles
loss with Dr. Stander; and that Plaintiff will produce for trial the testimony of PA
Lambert.

The question of subjective deliberate indifference as of May 6, 2010, is close. Dr.
Stander, in fact, had ordered many off-site consultations and tests to determine what was
best for Plaintiff until that point. He had ordered the corrective surgery for Plaintiff on
November 6, 2009, based on Dr. Webb's recommendation for Plaintiff to have the
surgery, prior to Dr. Webb's determination that she wished to have a second opinion of a
hand specialist before the surgery was performed. (Dkt. 107-7, p.11.) One of Plaintiff's
allegations is that, notwithstanding Dr. Stander's history of reliance on, and compliance
with, the experts' diagnoses and recommendations for treatment, Dr. Stander was
nevertheless deliberately indifferent for not questioning the expert recommendation to
wait for surgery when PA Lambert questioned the possibility that waiting for the surgery,
as Dr. Lamey had recommended, might cause permanent atrophy or muscle mass loss.

The Court concludes that both parties place undue emphasis on "what a reasonable

physician would have done" under the circumstances presented to Dr. Stander. Plaintiff's argument that any reasonable physician would have known that atrophy is likely to occur if an elbow is unused for three years is belied by Plaintiff's failure to show that either of the two orthopedic experts identified the risk of atrophy. *See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) (deliberate indifference may be inferred from a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment).

Likewise, Dr. Stander's argument that "it was not reasonable to expect [him] to second-guess Dr. Lamey's recommendation" does not address the simple question of whether Dr. Stander himself considered and drew the inference that Plaintiff's arm was likely to suffer irreparable muscle loss, and yet ignored that inference. The law is that "[i]t does not matter whether [the prison doctor's] assumptions and conclusions were reasonable . . . . So long as [h]e was not subjectively aware of the risk . . . and disregarded [it], [h]e was not deliberately indifferent." *Toguchi*, 391 F.3d at 1060.

In *Toguchi*, there was "absolutely no indication in the record that Dr. Chung *was aware of* a risk that Keane was suffering from Klonopin withdrawal," when she chose to administer a set of drugs that proved lethal; rather, she believed he was suffering from methamphetamine withdrawal. *See* 391 F.3d at 1059 (emphasis added). The court rejected the Toguchis' argument that the decedent's 19-year history of being on Klonopin, with

**MEMORANDUM DECISION AND ORDER - 44**

just a five-month gap prior to being treated by Dr. Chung, together with Dr. Chung's previous treatment of the decedent, was enough to show a genuine dispute of fact on the subjective prong of deliberate indifference. *Id*. In contrast, there *is* an indication in the record that Dr. Stander was personally informed of and aware of the risk, and all inferences must be construed in Plaintiff's favor.

A prison official cannot escape liability if the evidence shows that he "merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8. The *Farmer* court supported this principle by giving an example of  "when a prison official knows that some diseases are communicable and that a single needle is being used to administer flu shots to prisoners but refuses to listen to a subordinate who he strongly suspects will attempt to explain the associated risk of transmitting disease." *Id*.

At this stage of the litigation, the Court must draw all inferences in a light most favorable to Plaintiff, and in doing so the Court concludes that granting summary judgment in favor of Dr. Stander would be inappropriate because there are disputed issues of material fact regarding whether Dr. Stander knew a serious risk of harm existed if the surgery with accompanying post-operative physical therapy was delayed. Therefore, Defendants' Motion for Summary Judgment as to Dr. Stander will be denied.

The claim for punitive damages will be reserved for trial. If there is insufficient evidence to support such a claim after Plaintiff has presented his evidence, then Dr. Stander is not precluded from moving for judgment as a matter of law under Rule 50.

**MEMORANDUM DECISION AND ORDER - 45**

## CONCLUSION

In conclusion and for the reasons set forth above, all three pending Motions to Strike will be denied, one on mootness grounds. Defendant Amos's evidentiary objection to the grievance and her Motion for Summary Judgment will be denied. Defendants Stander and O'Connor's Motion for Summary Judgment will be granted as to PA O'Connor and denied as to Dr. Stander. All claims against PA O'Connor will be dismissed with prejudice.

## ORDER

**IT IS ORDERED:**

1.    Defendant Katherine Amos's Motion for Summary Judgment (Dkt. 106) is **DENIED**.

2.    Defendants Dr. Klint Stander and PA Rory O'Connor's Motion for Summary Judgment (Dkt. 107) is **GRANTED IN PART** as to PA O'Connor and **DENIED IN PART** as to Dr. Stander. All claims against PA O'Connor are hereby dismissed with prejudice.

3.    Plaintiff's Motion to Strike (Dkt. 109) is **DENIED**.

4.    Defendants Stander and O'Connor's Motion to Strike Paragraph Six of the Affidavit of Dustin Lancaster (Dkt. 118) is **DENIED**.

5.    Defendant Katherine Amos's Motion to Strike Paragraphs Five and Six to the Affidavit of Dr. Paul Collins Filed August 1, 2013 (Dkt. 120) is **DENIED as MOOT**.

**MEMORANDUM DECISION AND ORDER - 46**

6.   Counsel for the parties shall contact the Court's ADR Coordinator, Susie

Boring-Headlee, to set up a settlement conference with the Honorable

Mikel H. Williams, with the initial conference to be held no later **December**

**31, 2013**; additional conferences may be held after that date, if necessary.



DATED: November 27, 2013

Honorable Candy W. Dale
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 47**